[Civ. No. 14945.   Second Dist., Div. One.   Feb. 8, 1946.]

F. B. KEELAN, Appellant, v. BELMONT COMPANY (a Corporation) et al., Respondents.

LeRoy B. Lorenz for Appellant.

Macfarlane, Schaefer & Haun, Dexter D. Jones, Grady & Hotchkiss, David E. Field and Denis H. Grady for Respondents.

YORK, P. J.—Plaintiff seeks the return to him of $10,000 held in escrow by the defendant title company as a partial payment of purchase price on an uncompleted purchase of real and personal property. The defendant Armour, as trustee, was the owner of an occupied, 90-unit apartment hotel, together with certain furniture, fixtures and equipment therein contained. Defendant Belmont Company was a realty broker, acting as selling agent for the owner. On April 27, 1944, an agreement was executed in the form of a "Deposit Receipt," in which said Belmont Company acknowledged receipt from plaintiff Keelan of a cashier's check for $10,000 made payable

to Title Insurance & Trust Company. The stated purchase price of the apartment hotel was $336,000, said $10,000 being a deposit on account thereof, the balance payable within 30 days from date of the agreement, which provided (among other things) as follows:

"This offer is subject to: Approval of rent statement; O. P. A. statements to conform to reported rent statement; satisfactory termite report; inspection of building by purchaser and associates; approval of inventory and equipment. . . .

"In connection therewith it is hereby agreed:

"(1st) That should the purchaser fail to pay the balance of the purchase price, or fail to complete the purchase, as herein provided, the amounts paid hereon may, at the option of the seller, be retained as the consideration for the execution of this agreement by the seller.

"(2nd) . . . That should the title of said property prove defective or unmerchantable and should the seller be unable to perfect the same within a reasonable time from date hereof all amounts paid hereon shall be returned to the purchaser unless the purchaser elects to accept the title in said condition.

"(3rd) That should the improvements on said premises be destroyed or materially damaged prior to delivery of Deed or Agreement of Sale to supersede this Deposit Receipt, all amounts then paid hereon shall be returned to the purchaser unless the purchaser elects to complete the purchase regardless of the then condition of the improvements. . . .

"(5th) That the deposit and all other payments called for herein, if made with other than lawful money of the United States of America, may be converted into cash immediately, unless otherwise provided for herein, and held subject to the terms of this Deposit Receipt.

"(6th) That the essence of this Agreement is time and the undersigned real estate agent may, without notice, extend the time for an additional period of thirty days should said agent deem the extension advisable."

Plaintiff Keelan signed the agreement to purchase the property on the terms and conditions therein stated; defendant Armour, as trustee, signed the agreement to sell on the terms and conditions stated and in addition agreed to pay the Belmont Company a broker's commission in the sum of $8,650, "or one-Half of the deposit should same be forfeited by pur-

chaser, provided said amount shall not exceed the full amount of said commission.''

On the following day, i.e., April 28, 1944, the buyer and seller opened an escrow with the Title Insurance & Trust Company, when the usual escrow instructions were executed. No mention was made therein with respect to the retention by the seller or the forfeiture by the buyer of the $10,000 deposit, but consummation of the transaction was made ''contingent upon buyer's approval of rent statement, OPA statements, termite report, approval of inventory and equipment.''

Plaintiff failed to deposit the remainder of the purchase price within the time provided and defendant Armour, as seller, cancelled the escrow and subsequently entered into a contract for the sale of said property to another party. Plaintiff having made a demand for the return of the deposit, instituted the instant action to recover the same, ''on the theory that he is entitled to its return because he got nothing for it.''

Defendant Armour by way of counterclaim alleged the failure of plaintiff to pay the balance of the purchase price and claimed the deposit ''as consideration for the execution of said agreement'' for the sale of the apartment hotel, as provided by the deposit receipt.

The trial court found ''That the defendant and cross-defendant, Donald C. Armour, as Trustee, fulfilled all of the terms and conditions of the agreement of sale attached to plaintiff's complaint and marked Exhibit 'A,' and fulfilled the escrow instructions on his part to be performed. That the plaintiff and cross-defendant at no time objected to any of the furniture, furnishings or equipment or the items on the inventory submitted, but made every effort to sell the said property at a profit to himself, and that he did approve, by his actions and conduct, all of said items on said inventory and the equipment, furniture and furnishings, and that he failed to perform his part of the escrow instructions within the time provided and as extended, to-wit, July 1st, 1944. . . .

''Wherefore, . . . the Court makes the following Conclusions of Law: I. That the plaintiff failed to pay the balance of the purchase price and failed to complete the purchase of the said property within the time limits of the escrow, and that under the terms of the agreement . . . the defendant, Donald C. Armour, as Trustee, is entitled to retain the said sum of $10,000.00 as a consideration for the execution of said agree-

ment. II. That by reason of the agreement . . . one-half of said deposit belongs to the said Donald C. Armour, as Trustee, and that the defendant and cross-defendant Title Insurance & Trust Company is directed to pay one-half of the said escrow deposit to the defendant and cross-defendant Donald C. Armour, as Trustee, and one-half thereof to the defendant and cross-complainant, Belmont Company. . . .''

From the judgment which followed, plaintiff prosecutes this appeal, urging as grounds for a reversal thereof, the following:

''I. The provision in the printed portion of the deposit-receipt, upon which the forfeiture was adjudged, assumes 'to fix the amount of damages for an anticipated breach of contract' and is therefore, 'void,' under section 1670 of the Civil Code.

''II. The 'deposit-receipt' constituted a mere offer.

''III. The 'deposit-receipt' was superseded.

''IV. No support for the finding that Keelan approved the inventory and equipment 'by his actions and conduct.' ''

''Executory contracts for the sale of land frequently contain a provision to the effect that in case of breach by the purchaser his interest or rights under the contract shall be forfeited. Such forfeiture may take place automatically, without notice or other affirmative act on the part of the vendor, if it is expressly provided that time is of the essence of the agreement and that failure of the purchaser to perform shall operate as a forfeiture of all his rights, leaving installments of the price previously paid in the possession of the vendor. Where time is made essential and payment by the purchaser is to be made not later than a specified date, the forfeiture resulting from not making such payment is complete on that date and may not be undone by any subsequent act of the purchaser.'' (25 Cal.Jur. 607, § 113, and cases therein cited.)

As stated in *Ross* v. *Southern Cal. Junior College,* 15 Cal.App.2d 541, 543 [59 P.2d 1038] : ''One in default cannot maintain an action for recovery from the other of sums previously paid on the contract for the sale of real property. (*Rosenthal* v. *Silveira,* 42 Cal.App. 637 [184 P. 58] ; *Little* v. *Kennedy,* 86 Cal.App. 324 [260 P. 890] ; *Glock* v. *Howard & Wilson Colony Co.,* 123 Cal. 1 [55 P. 713, 69 Am.St.Rep. 17, 43 L.R.A. 199] ; *Los Angeles Gas & Electric Co.* v. *Amalgamated Oil Co.,* 156 Cal. 776 [106 P. 55] ; *Cross* v. *Mayo,* 167 Cal. 594 [140 P. 283].) ''

In *Rea* v. *Security Trust & Savings Bank.* 129 Cal.App.

663, 666 [19 P.2d 267], which involved agreements for the sale of real property, it was urged as it is here, that "the provisions in each of the contracts, providing for the forfeiture of the buyers' rights, are in violation of sections 1670 and 1671 of the Civil Code." In that case it was held by this court as follows: "The point is not applicable to this appeal. We have here, in each instance, a contract for payments to be made by the purchaser; a provision that 'time is of the essence of the agreement'; and failure of the buyers to make payments which had become due. Whether there was a forfeiture or not, in either event it remains true that the facts found do not entitle the plaintiffs to judgment as for damages, or for return of the money which they had paid as part of the purchase price. . . . The case made by the record comes within the rule stated in *Glock* v. *Howard & Wilson Colony Co.*, 123 Cal. 1, at page 10 [55 P. 713, 69 Am.St.Rep. 17, 43 L.R.A. 199], where it is said that after the vendee's breach of the covenant to pay, the vendor, still resting upon the contract, may remain inactive, yet retain to his own use the moneys paid by the vendee. (See, also, *Winter* v. *Kitto,* 100 Cal.App. 302, 309 [279 P. 1024].) "

In *Kelso* v. *Ulrich,* 67 Cal.App.2d 698, 701 [155 P.2d 407], appellant cited many decisions for the purpose of establishing that the contract there under consideration was void under section 1670, Civil Code, and that its provisions for forfeiture of the contract and of all moneys paid thereunder was not justified by section 1671. The court in that case stated: "None of the cited authorities arises out of a contract for the purchase and sale of real property with time of deferred payments of its essence. Those cases have to do with attempts to enforce the forfeitures which are condemned under the general equity rule which abhors a forfeiture. (See *Ballard* v. *MacCallum,* 15 Cal.2d 439, 444 [101 P.2d 692], where the chief justice distinguishes the cited case from those arising out of contracts such as that now before us.")

See, also, *Culligan* v. *Leider,* 65 Cal.App.2d 51, 58, 59 [149 P.2d 894], which involved an option designated as a deposit receipt containing a clause fixing the amount of liquidated damages and a provision that if the property was not marketable the purchaser should have the option of "receiving back" the deposit and should be "released from all obligation." It was there held that, in case of the seller's inability or refusal

to tender a marketable title, the purchaser was entitled to a return of the deposit, in accordance with the clause contained in the deposit receipt.

In view of the authorities above cited, appellant's proposition that the forfeiture clause in the agreement here under consideration is void, cannot be sustained.

Appellant urges that when the clause requiring the approval of the buyer to the inventory and equipment was added to the deposit receipt, it became merely an offer and not a binding agreement. An examination of the document reveals that it is complete with respect to terms and conditions of the sale; and that it is signed by both parties, who agreed to buy and to sell upon the conditions therein expressed. The fact that it was made subject to the buyer's approval of the designated items, does not detract from its binding effect, especially in view of the court's finding that buyer by his actions and conduct approved the inventory and equipment.

Appellant next argues that the deposit receipt was superseded by the escrow instructions. Escrow instructions are a customary and necessary means of consummating real estate transactions, they do not take the place of the agreement for sale but merely carry it into effect.

Appellant finally contends that there is no support in the record for the court's finding that he approved the inventory and equipment by his actions and conduct.

The finding complained of is to the effect that "the plaintiff and cross-defendant, at no time objected to any of the furniture, furnishings or equipment or the items on the inventory submitted, but made every effort to sell the said property at a profit to himself, and that he did approve, by his actions and conduct, all of said items on said inventory and the equipment, furniture and furnishings. . . ."

Evidence was introduced showing that appellant through a real estate agent advertised the apartment for sale and definitely offered it for sale at a price of $390,000. Appellant testified that he was informed at the time he "signed the original purchase agreement, that there was a party willing, able and ready to buy it at $375,000."

Mr. Chester F. Ericson, who described himself as "operator of Marsden Hotel Apartments for the account of Donald C. Armour, trustee," testified that he "met Mr. Keelan at the Title Insurance and Trust Company the latter part of April,

after Mr. Perren representing the Belmont Company, who had the exclusive agency for the sale of the property, had made an agreement, drawn an agreement which Mr. Keelan had signed, for the purchase of the property. We met to draw the formal escrow agreement with the Title Insurance and Trust Company. I met Mr. Keelan and also met Mr. LaFond there, Mr. Keelan's representative. The papers were drawn. I took them back for Mr. Armour to sign, and then presently provided the Title Insurance and Trust Company with all the necessary papers which the escrow agreement called for. I then met Mr. Keelan at the Title Insurance later, sometime in June when he was inspecting the rent statement, inventory, and so forth. . . . The next time I saw Mr. Keelan was at his request I met him at the apartment, a week prior to the termination of the escrow—the date of the escrow termination. Met him with Mr. LaFond, and Mr. Keelan requested of me an extension of the escrow period. I had, prior to that, agreed to a two-weeks extension. . . . I had no intention of creating any impression that we had all the time in the world to close the deal. At that time, however, I did not know that Mr. Keelan had been advertising the property and been attempting to sell it. . . . At the last meeting I had with Mr. Keelan and Mr. LaFond, Mr. Keelan said he was perfectly satisfied with the building. He wanted to purchase it. I had the loan for $265,000, which he could not consummate, and he required another thirty days to complete the purchase. I said, 'Mr. Keelan, I am interested only in selling this property, and if you put up $25,000 additional money as a further down payment on the purchase price, we will give you an extension.' But I did not propose to give an extension when I knew he was out trying to sell the property while he had it in escrow.'' This witness further testified that this conversation took place within a week prior to June 30, 1944.

Mr. LaFond, the real estate broker, who advertised the apartment for sale on behalf of appellant, testified that he and appellant made their final inspection of the equipment in the latter part of June a day or two before the close of escrow; that at that time the ''carpets were terrible; all moth eaten with moths and holes . . . 15 or 20 dogs we saw in the building . . . there were spots all over the carpets. Nobody home; people working. Dogs there all day.'' On cross-examination he testified that he first inspected ten or twelve of the apart-

ments in the building prior to April 27, and saw only one dog, at which time the condition of the carpets in those apartments was fair. That he undertook to advertise the place for sale for $390,000 and on June 11 and 18, he ran an ad in the Los Angeles Times reading: "Seven story, Class A—90 units, just like new. . . . Income about $80,000 a year. Price right. Call LaFond." In reply to the following question: "You would not knowingly and maliciously advertise a thing that was not up to that standard that you put in the paper, as a licensed realty broker, would you?", the witness stated: "I would, yes. They don't show you all the apartments. They only show you 4 or 5; the nicest ones. . . . The Court: Just a minute. Do you advertise an apartment like this when it was in the condition you described here, Mr. LaFond? A. Well, Judge, Your Honor— Q. Just answer the question. . . . A. Yes, sir. Q. Is that the way you conduct your business? A. Well, we are out to make commissions, Judge, your Honor. Q. Anyway you can? A. I make my final—what I saw looked nice when I first saw it." On redirect examination, this witness testified that he ran his advertisements for sale before he inspected the property and found it in bad condition; and that he considered the condition of the property up to the buyer rather than the broker.

Appellant testified that he made his last inspection of the premises the latter part of June. "It was after Mr. Ericson refused to give me a further extension. I had my plans made and completed to close the transaction, but after a fairly thorough inspection of the building, I could not see my way clear."

The foregoing amply supports the finding of the trial court complained of.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied March 4, 1946, and appellant's petition for a hearing by the Supreme Court was denied April 8, 1946. Carter, J., and Schauer, J., voted for a hearing.