[Civ. No. 19224. Second Dist., Div. Two. Nov. 18, 1953.]

THE MAJOR-BLAKENEY CORPORATION (a Corporation), Appellant, v. LE ROY JENKINS et al., Respondents.

Randolph J. Soker for Appellant.

Moidel, Moidel, Moidel & Smith for Respondents.

FOX, J.—This litigation grows out of two escrows for the purchase and sale of certain unimproved realty.

In May of 1949, two of the officers of plaintiff corporation, Mr. Major and Mr. Blakeney, personally purchased from defendants 52 lots located in Tract 4983, in which tract defendants also owned other lots. The 52 lots were subsequently transferred to plaintiff corporation, which was engaged in a program of building homes on 47 of these lots and in installing improvements incident to this program. In July, 1949, plaintiff commenced the construction of sewers and street grading improvements in connection with its development program. On September 6, 1949, plaintiff and defendants signed two sets of escrow instructions with respect to the purchase by plaintiff of an additional 114½ lots in Tract No. 4983. Escrow No. 1 was for the sale of 10 lots to plaintiff for $6,700 with a $1,500 deposit, which was paid to defendants in due course. The balance of $5,200 was to be deposited in escrow "on or before Jan. 1, 1950." In the event the latter deposit should not be made within the specified time, the escrow holder was instructed to cancel the escrow without further authorization, the seller to retain the $1,500 down payment.

Escrow No. 2 covered 104½ lots. The total price was $56,275, of which $1,000 was paid to the sellers outside of escrow. An additional $4,850 was required to be deposited in the escrow by February 1, 1950. The balance was to be evidenced by two notes secured by trust deeds on the property, one of which was to be a second deed of trust, subject to first deeds of trust securing certain construction loans. These instructions provided that the escrow holder cancel the escrow without further notice to the buyer if it failed to deposit $4,850 on or before February 1, 1950.

Plaintiff had entered into an arrangement with one Arnold North to obtain the financing to enable it to meet its obligations under the above escrow. On December 31, 1949, Mr. North advised plaintiff he was withdrawing and would not supply any money. Plaintiff notified Paul Walker, who had been defendants' agent in the transaction, that it would be unable to meet its payment of $5,200 due on Escrow No. 1 on January 1, 1950, and asked for about 20 days' grace. Upon plaintiff's failure to make the required deposit the escrow holder sent plaintiff a notice that it had cancelled the escrow pursuant to its instructions.

Thereafter, plaintiff requested defendant Le Roy Jenkins to reopen Escrow No. 1, but got no affirmative reply. On Janu-

ary 19, 1950, it tendered to the escrow holder a check for $10,050, authorizing it to credit $5,200 to plaintiff's account in Escrow No. 1, and the sum of $4,850 to plaintiff's account in Escrow No. 2 provided Escrow No. 1 was reopened. The escrow holder stated it had no authority to reopen Escrow No. 1. On February 2, 1950, the sum of $4,850 was deposited on behalf of plaintiff in Escrow No. 2, along with deeds of trust securing two notes. Plaintiff failed to affix its corporate seal to these instruments, but promised it would do so. At about this time, a controversy arose over a demand made by plaintiff upon defendants to execute amended instructions in Escrow No. 2 by inserting a recital in one of the deeds of trust subordinating it to a first deed of trust securing construction loans. Defendants at first objected to this request, but on May 2, 1950, they executed and deposited in Escrow No. 2 all instruments required of them. On the same day the escrow holder notified plaintiff of this fact by letter and informed plaintiff that the deeds of trust and notes it had executed on February 1, 1950, were being returned in order that its corporate seal might be affixed to all the documents. The letter also stated that as soon as the documents were returned properly executed, together with a remittance of $500 for expenses and estimated tax prorations, the escrow could proceed toward closing. Neither money nor trust deeds having been deposited, the sellers, on June 28, 1950, caused the escrow holder to mail plaintiff a notice to perform on or before the close of the business day of July 5, 1950, or the escrow would be "ipso facto cancelled." Plaintiff failed to deposit in escrow the required instruments and expense money by July 5th, but mailed the same to the escrow holder on that date, the letter arriving on July 6, 1950. Defendants refused to accept this late performance.

On about July 18, 1950, defendants consummated a deal with a Mr. Mulligan, whereby 152 lots in Tract 4893, including all of the lots in Escrows No. 1 and No. 2, as well as others, were transferred to a nominee of Mr. Mulligan at a price of $500 per lot. Plaintiff introduced evidence that in September, 1950, a corporation offered to buy outright from it all the lots included in either or both Escrows Nos. 1 and 2 at $700 per lot or to develop them in a joint building venture with plaintiff. Plaintiff asserted that the deal fell through when defendants notified the potential buyer that plaintiff had no interest in the land. Plaintiff stated that it did not know

prior to September 25, 1950, that defendants had transferred the property to other parties.

By its first cause of action, plaintiff seeks a declaration of the rights and duties of the parties under Escrow No. 1. The sixth cause of action is based on a quasi-contractual theory of recovery—that by its installation of certain streets and other improvements in its development of adjacent property as a part of its building program, plaintiff conferred a benefit in the amount of $8,131.13 on the 10 lots in Escrow No. 1 and on a group of other lots owned by defendants but not included in either of these escrows. The second, third, fourth and fifth causes of action relate to Escrow No. 2. In the second cause of action, plaintiff seeks a declaration that it had complied with the terms of Escrow No. 2 and that defendants committed a breach thereof. In the three other causes of action plaintiff seeks (a) damages for loss of anticipated profits and recovery of expenses; (b) damages for defendants' disparagement of its equitable title; and (c) exemplary and punitive damages for defendants' malice and bad faith in connection with this transaction.

Judgment below was entered quieting title in defendants to the property in dispute and to the money advanced by plaintiff as down payments in the respective escrows. Plaintiff attacks the findings as being unsupported by the evidence, and challenges the conclusions and judgment as being contrary to the law.

### Escrow No. 1

Plaintiff's contention that it had fully complied with its contract with respect to the 10 lots in Escrow No. 1 on January 19, 1950, or at the latest by February 2, 1950, is without factual support. By its terms, the contract made time of the essence, provided for cancellation upon failure of the buyer to deposit the full amount on or before January 1, 1950, and authorized the retention of the $1,500 deposit previously made by the buyer. Upon the failure of plaintiff to comply with its terms on January 3, 1950 (January 1st and 2d both being holidays) and time being of the essence, defendants justifiably terminated plaintiff's rights under the contract on January 6, 1950. (*Krobitzsch* v. *Middleton*, 72 Cal.App.2d 804, 812 [165 P.2d 729]; *Keelan* v. *Belmont Co.*, 73 Cal.App.2d 6, 10 [165 P.2d 930]; *Wilson* v. *Security-First Nat. Bank*, 84 Cal.App.2d 427, 430 [190 P.2d 975]; *Pitt* v. *Mallalieu*, 85 Cal.App.2d 77, 86 [192 P.2d 24].) The record

clearly establishes that there was no waiver of any of the terms of the contract and at no time did defendants, or their agent, give plaintiff valid reason to believe its rights under the escrow would be restored. Although defendant Le Roy Jenkins was repeatedly requested to reopen the escrow, plaintiff's witness, Mr. Blakeney, testified that Jenkins "was very stolid about it and noncommittal, although he refused to go ahead with them he never stated other than those notices which he caused the bank to give us." Defendants thus lawfully availed themselves of plaintiff's default and their own rightful termination of the contract to convey the property, of which plaintiff was never in possession, to a third party. ▇ Since the contract was no longer in force, defendants were not required to specify any objection to plaintiff's tender of January 19, 1950, section 2076, Code of Civil Procedure, being inapplicable to these facts.

Plaintiff further contends, however, that it is entitled to relief against total forfeiture of its down payment under section 3275 of the Civil Code.[1] This claim is meritorious. ▇ A vendee under a land sale contract, whose breach is neither willful, fraudulent nor grossly negligent, may be given relief in a situation where the retention by the vendor of installments paid under the contract would result in a forfeiture. (*Barkis* v. *Scott*, 34 Cal.2d 116 [208 P.2d 367].) ▇ Where the remedy of specific performance is not possible and restitution offers the only effective relief to a defaulting vendee, relief may be granted if the vendee is able to prove that his down payment exceeds the damages to the vendor produced by his default. (*Barkis* v. *Scott, supra,* and cases there cited; see *Baffa* v. *Johnson,* 35 Cal.2d 36, 39 [216 P.2d 13].) In *Freedman* v. *Rector, Wardens & V. of St. Matthias Parish,* 37 Cal.2d 16, 20 [230 P.2d 629], relying upon sections 1670, 1671, and 3369 of the Civil Code, the court stated that even a willfully defaulting vendee may be relieved from a forfeiture, since "the damage provisions of the Civil Code, together with the policy of the law against penalties and forfeitures provide an alternative basis for relief independent of section 3275." ▇ The burden rests upon the defaulting vendee seeking restitution to prove how much of his down

---

[1]Section 3275 reads: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

payment exceeds the vendor's damages. (*Baffa* v. *Johnson, supra.*)

In the instant case, the court disallowed plaintiff's claim to relief from a forfeiture on the basis of its conclusion "that plaintiff was grossly negligent" and upon its findings that the reasonable market value of the property on January 3 or 6, 1950, was $5,000 and that defendants would therefore not be unjustly enriched in retaining the $1,500. However, an analysis of the testimony clearly establishes that there is no evidentiary support for either of these propositions. ■ It is clear that the provision of the contract providing that on plaintiff's default, defendants could retain the down payment of $1,500, which was approximately 30 per cent of the purchase price, cannot be enforced as a valid clause providing for liquidated damages. (*Freedman* v. *Rector, Wardens & V. of St. Matthias Parish, supra,* p. 23.) Where, as in the case of Escrow No. 1, the down payment is large in relation to the total sales price, and "the evidence establishes that it would not 'be impracticable or extremely difficult to fix the actual damages' (Civ. Code, § 1671), such a provision may not be enforced as one for liquidated damages [citation]." (*Freedman* v. *Rector, Wardens & V. of St. Matthias Parish, supra.*) ■ The vendor's right to retain such a payment, therefore, must depend upon the showing made on the issue of the vendor's damage by the party charged with the burden of establishing an unjust enrichment—namely, by a defaulting vendee seeking a refund of his payments in excess of the vendor's damages. ■ In the absence of a showing of special damages by the vendor, section 3307 of the Civil Code[2] fixes a seller's recovery upon the buyer's breach of a land sale contract as the excess of the amount due him under the contract over the value of the property to him;—in other words, he is entitled to the "benefit of the bargain." ■ In cases involving sales of realty, the accepted rule is that the value of the property to the seller is to be determined as of the date of the breach of the agreement to purchase the property. (*Royer* v. *Carter,* 37 Cal.2d 544, 549 [233 P.2d 539]; *Drew* v. *Pedlar,* 87 Cal. 443, 450-451 [25 P. 749, 22 Am.St.Rep. 257]; *Employees'*

[2]Section 3307 reads: "The detriment caused by the breach of an agreement to purchase an estate in real property, is deemed to be the excess, if any, of the amount which would have been due to the seller, under the contract, over the value of the property to him."

*Participating Assn.* v. *Pine,* 91 Cal.App.2d 299, 301 [204 P.2d 965].)

The breach of the agreement affecting Escrow No. 1 occurred on or about January 3, 1950. The only direct evidence in support of the trial court's finding that the 10 lots encompassed in Escrow No. 1 had a value on that date of $5,000 comes from Mr. Walker, defendants' agent in effecting the sale, and Mr. Mulligan, the subsequent purchaser. The testimony of both of these witnesses was that on July 6, 1950, six months after the breach, the lots in question were worth only $500 each. However, such evidence of value six months after the breach cannot countervail as against the undisputed evidence that on the date of its breach, the vendee was still intent on proceeding with the contract, and that two weeks later it actually deposited the entire balance of the purchase price of $6,700. ▮ Certainly, for the purposes of computing a seller's damages upon a vendee's breach of contract, the value of the property to the seller on the date of breach is the best price obtainable from a purchaser ready, willing and able to buy at that time. The evidence is unequivocal that on January 19, 1950, defendants could have had $6,700 if they had elected to reopen Escrow No. 1. There is no evidence of fluctuation in the value of the property during the two weeks between plaintiff's default and its tender of the full sales price. It was patently error, therefore, in the face of these irrefutable facts, to find the property was worth $5,000 on January 3, 1950, on testimony relating to its value six months later. ▮ While defendants may have sustained some damages as a result of plaintiff's breach, it is apparent that, on the record before us, the court permitted the enforcement of a stringent forfeiture against a vendee who, though two weeks late, was willing, able and anxious to take the land and pay, in cash, the full contract price. (See *Easton* v. *Cressey,* 100 Cal. 75, 78 [34 P. 622].) The policy of the law is now too firmly opposed to the exaction of penalties to suffer plaintiff's loss of its full $1,500 when this amount appears to be wholly disproportionate to the detriment sustained by defendants on Escrow No. 1. (Civ. Code, § 3307; *Barkis* v. *Scott,* 34 Cal.2d 116 [208 P.2d 367]; *Freedman* v. *Rector, Wardens & V. of St. Matthias Parish,* 37 Cal.2d 16 [230 P.2d 629].)

▮ Nor is plaintiff precluded from the application of Civil Code section 3275 by the court's determination that it was grossly negligent, a conclusion which is completely un-

warranted. The record clearly shows that plaintiff was relying for funds on a commitment made by Alfred North, and had no reason to expect they would not be forthcoming. Mr. North withdrew from the transaction on December 31, 1949, just three days before plaintiff was required to perform. Plaintiff thereupon acted with sincerity and diligence in attempting to keep the contract alive and procuring the requisite money on January 19, 1950. The language of the courts in *Barkis* v. *Scott,* 34 Cal.2d 116, 123 [208 P.2d 367], in disavowing a similar finding by the trial court, is particularly apposite to plaintiff's conduct herein: "It does not evidence that 'entire want of care which would raise a presumption of the conscious indifference to consequences' necessary to constitute gross negligence [citations]."

For the foregoing reasons, we conclude that the court erred in permitting defendants to retain the entire down payment of $1,500, rather than in applying the equitable principles above discussed to give plaintiff the measure of relief warranted by the circumstances.

### Escrow No. 2

The instructions in this escrow related to the sale of 104½ lots for a total price of $56,275, of which $1,000 was paid outside of escrow, plaintiff being obligated to deposit the additional sum of $4,850 on February 1, 1950. It was provided that the balance was to be evidenced by two notes for $15,651 and $34,774, each of which was to be secured by a deed of trust on the property running to defendants. The instructions further recited that the deed of trust securing the note for $15,651 was to be a second deed of trust, subordinate to first deeds of trust securing construction loans on 37 of the lots covered by Escrow No. 2. Taxes were to be prorated between the parties as of December 1, 1949. The instructions authorized the escrow holder to cancel the escrow without further notice (and the seller to retain the $1,000 deposit) upon the buyer's failure to deposit $4,850 on February 1, 1950; and, in the event the escrow was not closed by March 1, 1950, either party could make a written demand for the return of money or instruments deposited.

From the conduct and dealings of the parties subsequent to February, 1950, it is obvious that the conditions as to strict time of performance had been waived, and neither could thereafter put the other party in default without full

performance on his part accompanied by a notice to the other to perform within a reasonable time. (*Kerr* v. *Reed*, 187 Cal. 409, 414 [202 P. 142]; *Lemle* v. *Barry*, 181 Cal. 6 [183 P. 148].) It is not here necessary to determine whether defendants' refusal to amend the escrow instructions and insert in the note for $15,651, and the deed of trust securing it, the recitals requested by plaintiff was unjustified, since any possible nonperformance by defendants was cured by their execution of and deposit in escrow of the required instruments on May 2, 1950. On this same date, the escrow holder wrote to plaintiff enclosing a copy in duplicate of the amendment to the escrow instructions signed by defendants, and the deeds of trust which plaintiff had executed without affixing its corporate seal and which it had promised to affix as early as February, 1950. This letter stated that upon return of a signed copy of the escrow amendment and of the deeds of trust bearing the corporate seal, together with $500 to cover estimated tax proration and expenses, a title search would be ordered and the escrow closed as soon as possible. ■ Plaintiff argues that the return of the trust deeds for purposes of affixing the corporate seal was uncalled for, since it is recognized that a corporation's "failure to affix a seal does not affect the validity of any instrument." (Corp. Code, § 801(b).) While this is perfectly true, nevertheless defendants had a right to have such documents regularly executed. They were not required to accept an instrument bearing a seeming irregularity which might affect its merchantability among persons nonconversant with the fact that the absence of a corporate seal from a trust deed was not fatal to its validity. ■ Furthermore, a deed bearing the seal of the corporation is presumptive evidence of the authority of its officers to execute it. (*Fickeisen* v. *Peebler*, 98 Cal. App.2d 320 [219 P.2d 864]; *Landis Brothers Co.* v. *Lawrence*, 104 Cal.App. 499 [286 P. 177].) ■ Where a seal is absent from a corporate deed, the burden of proof is upon the party relying on the deed to establish the authority of the corporate agents or officers executing it. (*Fontana* v. *Pacific Can Co.*, 129 Cal. 51 [61 P. 580]; *Barney* v. *Pforr*, 117 Cal. 56 [48 P. 987]; *Fischer* v. *Lukens*, 41 Cal.App. 358 [182 P. 967]; 32 C.J.S., p. 651.) ■ Defendants were justified in wishing to be fully protected in the event of future litigation and seeking to regularize the formalities of the transaction by the simple expedient of procuring the corporate seal to be affixed in advance of any controversy. However,

plaintiff made no response of any kind to this letter—it neither complied nor objected, at a time when defendants had already tendered full performance and the consummation of the transaction awaited only plaintiff's action.

Confronted with approximately seven weeks of inaction on plaintiff's part, defendants could not be expected to prolong the impasse indefinitely. They thereupon exercised their right of putting plaintiff in default by serving notice on June 29th of an intended termination of the contract unless plaintiff performed by July 5, 1950. █ The trial court found that this was a reasonable time to perform the acts required, which was a question of fact for the trial court to determine from all the circumstances of the case. (*Hoppin* v. *Munsey*, 185 Cal. 678 [198 P. 398].) In view of the fact that only the affixing of the corporate seal to several documents and the deposit of $500 was involved, it cannot be said that the time allowed was unreasonable as a matter of law.

█ Plaintiff argues that in any event it did, on July 5, 1950, affix its corporate seal to the documents and *deliver* them on the same day, together with $500, to the escrow holder. It contends that it effected such delivery by the act of posting the money and instruments on that day addressed to the escrow holder. However, the only authorities it cites hold that a contract is complete when a letter of acceptance is posted. This elementary contract principle has no application in a case where physical delivery *at* a given place, by a designated date, is contemplated.

█ Plaintiff cannot successfully contend that defendants were in default by refusing to accept a late tender, nor that their subsequent conveyance to another buyer constituted a breach of contract. Upon its failure to make payment at the appointed time after notice from defendants, plaintiff "was in default, and no further affirmative act by defendants was necessary to terminate the contract." (*Pitt* v. *Mallalieu*, 85 Cal.App.2d 77, 81 [192 P.2d 24] ; *Schwerin Estate Realty Co.* v. *Slye*, 173 Cal. 170, 173 [159 P. 420].)

█ So far as concerns Escrow No. 2, plaintiff has failed to establish that its down payment of $1,000 exceeds defendants' damages under the contract of sale of land for $56,275. There was substantial evidence to support the court's finding that at the time of the breach, the value of the property did not exceed $52,275. (*Shurtleff* v. *Marcus Land etc. Co.*, 59 Cal.App. 520, 523 [211 P. 244].) Furthermore, the court was entitled to take into consideration the

fact that the land was off the market for almost a year, that no interest had been paid, that added taxes fell due, and similar factors. It cannot be said that defendants were unjustly enriched by pocketing the $1,000 down payment in Escrow No. 2. (See *Baffa* v. *Johnson*, 35 Cal.2d 36 [216 P.2d 13] ; *Barkis* v. *Scott*, 34 Cal.2d 116, 122 [208 P.2d 367] ; *Zellner* v. *Reeve*, 94 Cal.App.2d Supp. 978, 982 [211 P.2d 395].)

In the light of the views here stated with respect to the propriety of defendants' conveyance upon plaintiff's nonperformance at the required time, the trial court correctly determined that the third, fourth and fifth causes of action pleaded were without merit.

### QUASI-CONTRACTUAL RECOVERY

We pass now to a consideration of plaintiff's claim, alleged in part in its first cause of action and more elaborately and specifically expressed in its sixth cause of action, that it has conferred a benefit on defendants in excess of $8,000 by virtue of improvements it made to property belonging to defendants. Approximately $4,000 of this amount purports to be based on substantial permanent improvements made with respect to the 10 lots in Escrow No. 1. The balance is claimed for alleged benefits bestowed on other lots owned by defendants, not included in either Escrows No. 1 or No. 2, in the form of improvements plaintiff was required to make to obtain the approval of the city of Los Angeles on an adjacent home-construction program in which it was engaged.

The evidence shows that in May, 1949, plaintiff corporation's predecessors in interest (Mr. Major and Mr. Blakeney, then operating as partners or joint venturers) purchased from defendants 52 lots located in Blocks 33, 34, 35 and 36 of Tract No. 4983. At that time, no agreement had as yet been made regarding the purchase of the lots in Escrows No. 1 or No. 2. Plaintiff proceeded to build dwelling houses on 47 of these lots. In the course of developing this construction project plaintiff began, in about July, 1949, the installation of certain improvements on or abutting streets such as Hobart Blvd., Harvard Blvd., LaSalle Ave., 212th Street, and Denker Ave., which either traversed or ran along the perimeter of the above described property. The improvements on the streets named, which Mr. Major testified were not fully completed until March, 1950, included tacking into the main sewer outfall trunk, the installation of utilities, manholes,

"Y" connections and curbing, and filling, grading and paving. This was required of the plaintiff developer by the city of Los Angeles, in whose favor plaintiff was required to execute a bond for the work. The improvements thus installed by plaintiff in conjunction with its building program passed or fronted several groups of lots (totalling about 26 lots) owned by defendants, as well as lots not owned by either plaintiff or defendants. The sewer installations and paving on Denker Ave., also commenced about July, 1949, abutted the 10 lots included in Escrow No. 1. Mr. Major testified that in August, 1949, Mr. Jenkins had signed a memorandum covering the sale of these 10 lots and the others in Escrow No. 2, but that the memorandum had been destroyed. Mr. Jenkins testified that there was no agreement prior to September 6, 1949, the date of the escrow instructions, and the court found in accordance with this testimony. The court further found, in essence, that the improvements abutting the property in Escrow No. 1, were made in July, 1949, by the developers of an adjacent tract of land, and that the capital outlay for these improvements, made in July, 1949, was made without any reliance or inducement by defendants that the lots in Escrow No. 1 would be sold to plaintiff. It also found that defendants were not liable to pay for any improvements installed by plaintiff affecting the land involved in its sixth cause of action, nor were any payments made by plaintiff in protection of its interests and to relieve itself from legal liability under its bond (to the city of Los Angeles) chargeable to defendants.

Plaintiff has made a comprehensive attack on these findings as being contrary to the evidence and contends the court failed to follow applicable principles in denying to it quasi-contractual recovery based on unjust enrichment. In so contending, plaintiff emphasizes, out of a mass of conflicting evidence, testimony favorable to itself, with which this court cannot be concerned. For an examination of the entire record discloses that the findings and conclusion made on this issue are amply sustained by the evidence and the reasonable inferences to be drawn therefrom.

It is fundamental, of course, that the gravamen of a quasi-contractual action grounded on unjust enrichment is the equitable principle that a person should not be allowed to enrich himself at the expense of another. (*Lazzarevich* v. *Lazzarevich*, 88 Cal.App.2d 708 [200 P.2d 49]; *Miller* v. *Schloss*, 218 N.Y. 400 [113 N.E. 337]; 17 C.J.S., Contracts,

pp. 322-325; Woodward, The Law of Quasi Contracts, p. 9.)
 It presupposes the acceptance and retention of a bene-
fit by one party with full appreciation of the facts, under cir-
cumstances making it inequitable for the benefit to be retained
without payment of the reasonable value thereof. (17 C.J.S.,
Contracts, pp. 322 et seq.) Where no benefit has been re-
ceived, the law will not raise an obligation to make restitution
or imply a contract to pay. (See *Rotea* v. *Izuel*, 14 Cal.2d
605, 611 [95 P.2d 927, 125 A.L.R. 1424]; *Rowell* v. *Crow*,
93 Cal.App.2d 500, 503 [209 P.2d 149].) The record is
barren of proof that defendants in any fashion received any
enhancement in the reasonable market value as a result of
the character of improvements installed by plaintiff; nor is
there proof that defendants derived any extra profit traceable
to this source. On the contrary, the record shows that de-
fendants received no more than they would have gotten if
the transaction with plaintiff had materialized without inter-
ruption.

Furthermore, there is another aspect of this matter which
is of extreme significance in the context here present. The
evidence and its reasonable inferences demonstrate that the
improvements were undertaken as a part of plaintiff's own
building program, that they were initiated without reference
to any agreement with defendants concerning the properties
here in dispute, that defendants at no time remotely suggested
they would pay for or contribute to these improvements made
adjacent to or abutting other properties they chanced to own.
The whole situation negatives the idea that defendants were
expected to participate financially, and any benefit that could
possibly have flowed to defendants was incidental to plans
and obligations to which plaintiff alone had committed itself.
 The general rule applicable, absent other equities, is
that a party is not entitled to reimbursement for improve-
ments voluntarily made to another's land in the absence of
an express or implied contract to pay. (*Callnon* v. *Callnon*,
7 Cal.App.2d 676, 680 [46 P.2d 988]; *Titus* v. *Poland Coal
Co.*, 275 Pa. 431 [119 A. 540]; *Meeker* v. *Oszust*, 307 Mass.
366 [30 N.E.2d 246]; *Dudzick* v. *Lewis*, 175 Tenn. 246 [133
S.W.2d 496].) A related principle, particularly ap-
plicable to the instant case, is adopted by the Restatement of
Restitution, section 106, in the following language: "A person
who, incidentally to the performance of his own duty or to
the protection or the improvement of his own things, has
conferred a benefit upon another, is not thereby entitled to

contribution.'' The courts of many jurisdictions support this proposition. (*Raynor* v. *Drew,* 72 Cal. 307 [13 P. 866] ; *United States* v. *Pacific R. Co.,* 120 U.S. 227 [7 S.Ct. 490, 30 L.Ed. 634] ; *Wadleigh* v. *Katahdin Pulp & Paper Co.,* 116 Me. 107 [100 A. 150] ; *Stern* v. *Haas,* 54 N.D. 346 [209 N.W. 784].) ▮ A property owner who conceivably acquires some incidental benefit from an adjoining landowner's improvements made pursuant to the latter's private development plans is not required to account for the benefits so received.

The evidence already summarized fully sustains the court's view that there was here present neither unjust enrichment of defendants nor their conscious acceptance of any benefits for which a promise to pay might be implied. The expenditures made and obligations paid were done exclusively in furtherance of plaintiff's own interest and to discharge commitments for which it alone was responsible. Since defendants were not liable in any way under the bond executed by plaintiff, there is no rule of law which would entitle plaintiff to a right of contribution or subrogation as against defendants in the circumstances here present.

Plaintiff dwells at length upon other findings relating to the second, third, fourth, fifth and sixth causes of action, which it asserts are unsupported by the evidence. ▮ However, since the findings already discussed were supported by the evidence and fully sustain the judgment with respect to these causes of action, it becomes immaterial whether other findings objected to are sustained by the evidence or not. (*Kellerman* v. *Maier,* 116 Cal. 416, 422 [48 P. 377] ; *Hatton* v. *Gregg,* 4 Cal.App. 542, 546 [88 P. 594] ; *Sands* v. *Eagle Oil & Ref. Co.,* 83 Cal.App.2d 312, 321 [188 P.2d 782].)

The judgment is correct as to all causes of action except the first. It is, however, reversed with directions to retry only the issue of defendants' damages under the first cause of action and determine what sum, if any, should be offset against plaintiff's $1,500 deposit. The purported appeal from the order granting motion to dismiss notice of intention to move for a new trial is dismissed. Each party to bear its own costs on appeal.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied December 7, 1953, and appellant's petition for a hearing by the Supreme Court was denied January 13, 1954.